**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **Michael H. Lotto et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | No. 3:21-cv-1417 (VLB) |
| | : | |
| **v.** | : | |
| | : | **January 9, 2023** |
| **Jeremy S. Tendler et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM OF DECISION**</u>
<u>**GRANTING DEFENDANTS' MOTION TO DISMISS [ECF 14]**</u>

Federal law enforcement officers applied for and executed a search warrant at Michael H. Lotto and Ernest Canteen's (collectively "Plaintiffs") house at 9 North Bank Street, New Haven, Connecticut ("9 North Bank Street").  Plaintiffs filed this three-count *Bivens*[1] action against Jeremy S. Tendler ("Tendler"), a United States Postal Service Inspector, who authored the search warrant application affidavit for 9 North Bank Street, as well as eleven other federal officers involved in executing the search warrant, including David Lindberg, Jason Bourdeau, Jesse Nason, Mark Scichlione, Tony Lebron, Steve Coughlin, Steve Brown, Brian Martineau, Justin Lathrop, Joe Masetti, and Colin Hartnett (collectively with Tendler, "Defendants").  Plaintiffs allege Tendler omitted pertinent facts from his search warrant affidavit and, in doing so, he and the other

---

[1] Under *Bivens*, a plaintiff may sue a federal officer—in his or her individual capacity—for damages resulting from a violation of the plaintiff's constitutional rights.  *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971).

defendant officers violated Plaintiffs' Fourth Amendment rights by conducting an unreasonable search and seizure of their house.

Before the Court is Defendants' motion to dismiss brought under to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which allows a party to assert by motion a defense of failure to state a claim upon which relief can be granted. Defendants argue the case should be dismissed because they are entitled to qualified immunity.  (Mot. to Dismiss, ECF 14.)  Plaintiffs object.  (Obj., ECF 28; Opp. Mot. to Dismiss, ECF 29.)

For the reasons stated below, the Court grants Defendants' motion to dismiss.

## I.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  At the first step, "[a] court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.*  (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well pleaded factual allegations,' assumed to be true, 'plausibly give rise to an

entitlement to relief.'" *Id.* "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

A court's review of a motion to dismiss under Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). In cases such as this one, a court review on the motion to dismiss may include a search warrant affidavit where the complaint relies upon assertions in the affidavit. *See Cayo v. Sefcik*, No. 14–CV–38, 2014 WL 3419578, at *5 n.10 (D. Conn. July 11, 2014) ("The Court can consider the contents of the [a]rrest [w]arrant [a]pplication and its attachments because they are discussed extensively in the complaint."); *see also Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 286 (S.D.N.Y. 2015) (considering a search warrant affidavit because plaintiffs' claims for unreasonable search and seizure were "explicitly based on their assertions that the warrant was invalid" and plaintiffs did not challenge the authenticity of the document); *Vessa v. City of White Plains,* No. 12–CV–6989, 2014 WL 1271230, at *4 n.9 (S.D.N.Y. Mar. 27, 2014) ("The Court may consider the Search Warrant Order, as it is clearly incorporated in the . . . [c]omplaint by reference. Indeed, the crux of Plaintiff's case is that Defendants wrongfully obtained the warrant at issue using fabricated and unsubstantiated information.") (citations omitted), *aff'd*, 588 Fed. Appx. 9 (2d Cir. 2014).

## II.   BACKGROUND

Plaintiff Michael Lotto is an employee of the United States Postal Service ("USPS") and resides with Plaintiff Ernest Canteen at 9 North Bank Street. (Compl. ¶¶ 5–6, 22.)  Defendant Jeremy S. Tendler is a sworn United States law enforcement officer employed as a Postal Inspector, and the other Defendants are also federal law enforcement officers.  (*Id.* ¶¶ 7–20.)

Beginning in November 2017 and through May 2018, Plaintiffs received "threatening and extortionate" letters from Jason A. Smith, who at the time of sending the letters, was in the custody of the Connecticut Department of Correction at Cheshire Correctional Institute in New Haven, Connecticut.  (*Id.* ¶¶ 21–22.)  Smith has a criminal history, which includes convictions for larceny, burglary, and identify theft.  (*Id.* ¶ 29.)  In his letters, Smith demanded Plaintiffs deposit funds into his inmate account.  (*Id.* ¶ 21.)  Smith's letters threatened to contact Lotto's employer, the USPS, with allegations of criminal conduct.  (*Id.* ¶¶ 22–23.)  Plaintiff's refused Smith's demands.  (*Id.* ¶ 23.)

In April 2018, Smith acted on his threats by sending a letter to the USPS alleging "Plaintiffs were operating a narcotics enterprise and purchasing counterfeit currency and narcotics on the dark web."  (*Id.* at ¶ 24.)   Smith alleged in this letter that Lotto was using his position with the USPS to "ensure packages of narcotics purchased on the dark web arrived safely at Plaintiffs' home."  (*Id.*)

Around the time Tendler received Smith's letter, April 2018, he began investigating Plaintiffs.  (*Id.* ¶¶ 7, 26.)  Shortly after opening the investigation, in May 2018, law enforcement officers met with Smith on two separate occasions.

(*Id.* ¶ 27.)  During these meetings, Smith reiterated his allegations and was monetarily compensated for the information he provided.  (*Id.* ¶ 28.)  Following Smith's release from incarceration in August 2018, Tendler involved Smith in two attempts to make controlled purchases of narcotics from Canteen.  (*Id.* ¶¶ 30–32.) Information gathered from Smith's initial letter to USPS and the controlled purchases was utilized in a supporting affidavit submitted with Tendler's application for a search warrant of 9 North Bank Street. (Search Warrant Aff., Dkt. 15; Compl. ¶¶ 33–34.)

On October 18, 2018, Tendler applied for a search warrant in the United States District Court for the District of Connecticut ("the District Court") to search the premises of 9 North Bank Street.  (Search Warrant Aff.; Compl. ¶ 33.)  The search warrant's affidavit ("the affidavit") notably included information gathered from interactions with Smith, listing Smith as "Confidential Informant 1." *Compare* (Search Warrant Aff. ¶ 15 (identifying "Confidential Informant 1" as an inmate at Cheshire Correctional Institution who wrote a letter in April 2018 alleging Plaintiffs were involved in a drug conspiracy)) *with* (Compl. ¶¶ 23–24 (identifying Smith as the author of the letter in April 2018 alleging Plaintiffs were involved in a drug conspiracy)).

Tendler stated in the affidavit, he began investigating Canteen and Lotto "in or around April of 2018."  (Search Warrant Aff. ¶ 14.)  Tendler suggests the investigation began when he received a letter from "an inmate . . . at the State of Connecticut Cheshire Correctional Institute," who claimed that Lotto was

trafficking controlled substances.  (*Id.* ¶¶ 15, 21.)  The affidavit states the letter

included the following, in part:

> First off this is a serious matter in [r]egards to [an] employee who
> works there by the name of Michael Lotto from 9 North Bank Street
> New Haven CT.  He was arrested in 2014 for drugs and again 2 months
> ago with Ernie Canteen for [assault] there is a protective order now in
> place.  BUT MOST of all every 2 weeks 2 ounces of crystal [m]eth
> comes through the post office address to Canteen at 9 North Bank
> Street and Mike [L]otto makes sure it gets there to his husband Ernie
> who [used] to work there also.  Along with GHB in shampoo bottles
> that come through. Mike goes home every day around 9:45am-
> 10:30am to smoke Meth and shoot some heroin . . . Ernie & Mike [L]otto
> order Crystal Meth off the dark web.

(Search Warrant Aff. ¶ 16.)

Tendler investigated the claims in the letter.  Smith's claim that Lotto lived

at 9 North Bank Street was corroborated by law enforcement records, which also

found Canteen lived at this address as well.  (*Id.* ¶¶ 17, 20.)  Smith's claim that

Lotto worked for the USPS was corroborated through employment records.  (*Id.* ¶

17.)  Smith's claim that Lotto was arrested in 2014 for drugs was corroborated

through employment records that referenced Lotto's March 2014 arrest for

narcotics related offenses.  (*Id.* ¶ 18.)  Lastly, Smith's claim that Lotto and

Canteen were arrested for assault in 2018 was corroborated through law

enforcement records.  (*Id.* ¶¶ 19–20.)   Tendler concluded that the law

enforcement and employment database searches corroborated some of the

information contained in Smith's letter.  (*Id.* ¶ 20.)

The affidavit went on to discuss law enforcement officers' initial

interactions with Smith.  According to the affidavit, in March 2018, New Haven

Police interviewed Smith, who stated that he was previously involved in the drug

trafficking operation with Lotto and Canteen and he was willing to testify in court against them.  (*Id.* ¶ 22).  The affidavit states Smith told law enforcement that a drug operation was being run out of 9 North Bank Street, where Lotto and Canteen reside, and out of Canteen's mother's residence at 7 North Bank Street. (*Id.* ¶ 23.)  Further, the affidavit provides that Smith stated Lotto was a postal employee, who used his position to intercept packages of large quantities of controlled substances, which Lotto and Canteen would break down and redistribute.  (*Id.* ¶ 24).  Smith provided specific information relating to the trafficking organization, including information on the customers, costs, profits, and methods of organization.  (*Id.* ¶ 25.)  In addition, Smith claimed the organization used the dark web to purchase counterfeit currency, which were used to buy pre-paid purchase cards from Walmart in New Haven.  (*Id.* ¶ 26). Lastly, Smith claimed Lotto and Canteen purchased small amounts of cocaine on the dark web.  (*Id.* ¶ 27.)

The search warrant affidavit detailed three intercepted parcels of narcotics addressed to 9 North Bank Street, which again was identified as Plaintiffs' address.  The first package was intercepted on April 22, 2018, two days before Smith's letter, which contained one and a half kilograms of Gamma-Butyrolactrone ("GBL").  (*Id.* ¶¶ 28–29.)  The second package was intercepted on May 23, 2018, which contained approximately one and a half kilograms of GBL. (*Id.* ¶¶ 30–31.)  The third package was intercepted on June 8, 2018, which contained approximately twenty-nine grams of methamphetamine.  (*Id.* ¶¶ 53–55.)

7

Tendler also detailed four separate controlled purchases in the search warrant affidavit.  The first two purchases were completed with a second confidential informant on May 9 and June 5, 2018, who purchased one and three and half grams of methamphetamine, respectively, from Canteen at 9 North Bank Street.  (*Id.* ¶¶ 32–52.)  The second two purchases were completed with Smith on September 27 and October 16, 2018, who purchased one and seven hundredths and one and six hundredths grams of methamphetamine, respectively, from Canteen and one of Canteen's runners.  (*Id.* ¶¶ 56–73).

Relying on this information, Tendler claimed in the search warrant affidavit "there is probable cause to believe that search of [9 North Bank Street] will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes."  (*Id.* ¶ 2.)  In response to the search warrant application and its supporting affidavit, the District Court (Merriam, J.) authorized the search warrant for Plaintiffs' home.  (Compl. ¶¶ 40–41.)

On October 25, 2018, Tendler and the eleven other federal law enforcement officers listed as defendant's in this action executed the search warrant at 9 North Bank Street.  (*Id.* ¶ 44.)  Plaintiffs claim that law enforcement did not find counterfeit currency, "black-tar heroin," or any "substantial" amounts of crystal methamphetamine in Plaintiffs' home.  (*Id.* ¶ 45.)  In addition, there lacked evidence that Plaintiffs utilized the dark web to purchase narcotics and that Lotto used his USPS position to facilitate his operations.  (*Id.* at ¶ 46.)  Federal law

enforcement did not arrest Plaintiffs, and Plaintiffs were not charged with nor indicted for a federal offense.  (*Id.* at ¶ 47.)

On October 25, 2021, Plaintiffs commenced this action.  (Compl.)  On Counts One and Two, Plaintiffs claim Defendants violated their Fourth Amendment rights to be free from unreasonable searches and seizures.  (*Id.* ¶¶ 49–65.)  Plaintiffs claim "Tendler willfully withheld vital information regarding Smith's propensity for dishonesty to intentionally deceive the Magistrate Judge." (*Id.* ¶ 49.)  Plaintiffs propose the following set of "corrections" that they claim should have been included in the search warrant application affidavit:

1) The source of the information, Inmate Smith's recent criminal history, consisting of at least seven (7) prior convictions for crimes of dishonesty and moral turpitude,

2) Smith's extortion scheme, demanding payments from Plaintiffs and threatening to contact Plaintiff Lotto's employer with damaging information and allegations if Plaintiffs failed to pay him,

3) That the information that caused Defendant [ ] to open the investigation came from Inmate Smith's extortion letter that was sent because Plaintiffs refused to pay the ransom, [and]

4) That Inmate Smith was monetarily compensated by law enforcement for the information provided.

(*Id.* ¶ 37.)

In addition, Plaintiffs claim the other officers knew or should have known of Tendler's intentional violation and should have intervened.  (*Id.* ¶ 55.)  In Count Three, Plaintiffs claim Defendants violated their Sixth Amendment right to be free from wrongful prosecutions without probable cause. [2]  (*Id.* at ¶¶ 66–75.)

---

[2] Plaintiffs have abandoned Count Three, which they concede fails to state a claim upon which relief can be granted.  *See, e.g.*, *Katsaros v. Serafino*, No.

III.   **DISCUSSION**

Defendants argue they are entitled to qualified immunity on all claims and thus, the case should be dismissed.  (Mot. to Dismiss.)

Qualified immunity is an affirmative defense, which may be asserted in a motion to dismiss, "as long as the defense is based on facts appearing on the face of the complaint."  *Benzman v. Whitman*, 523 F.3d 119, 125 (2d Cir. 2008). Qualified immunity "affords law enforcement officers a broad shield from claims for money damages arising from the performance of their duties."  *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017).  This shield provides government officials with both immunity from suit and a defense to liability.  *Looney v. Black*, 702 F.3d 701, 705 (2d Cir. 2012).

Government officials are shielded by qualified immunity "unless a plaintiff pleads facts showing (1) that the official[s] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  When a plaintiff fails to show a constitutional right was violated, "no further inquiry is necessary 'because where there is no viable constitutional claim, defendants have no need of an immunity shield.'"  *Ganek*, 874 F.3d at 81 (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 388).  If a constitutional injury is established, the shield will still apply "unless [the] plaintiff can also show that the right violated was 'clearly established at the time of [the] defendant's actions.'"  *Id.*  And the violated

---

300CV288PCD, 2001 WL 789322, *5 (D. Conn. Feb. 28, 2001) (finding plaintiffs can explicitly abandon a claim in response to a motion to dismiss).  Therefore, the Court dismisses Count Three because Plaintiff has abandoned that claim.

right is "clearly established" when "every 'reasonable official would [have understood] that what he is doing violates that right'" at the time of the challenged conduct. *Al-Kidd*, 563 U.S. at 732 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In determining which of the two qualified immunity prongs should be addressed first, the Court "should be permitted to exercise [its] sound discretion . . . in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see Ganek*, 874 F.3d at 81 n.5 ("The two-step inquiry . . . need not always be conducted sequentially; a court may assume, without deciding, that the facts state a constitutional violation and grant qualified immunity on the ground that the right was not then clearly established.").

Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231 (2009).  However, "the 'driving force' behind [the] creation of the qualified immunity doctrine [is] a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Id.*  And the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).  With this, qualified immunity ultimately protects "all but the plainly incompetent or those who knowingly violate the law," *Ashcroft*, 563 U.S. at 743 (internal quotation marks omitted); *see Ganek*, 874 F.3d at 81.

Plaintiffs claim Defendants violated their Fourth Amendment rights.  The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  When deciding cases in which plaintiffs allege important information was omitted from a search warrant affidavit, courts focus on the clause protecting plaintiffs from "unreasonable searches and seizures."  U.S. Const. amend. IV.  *See, e.g.*, *Ganek*, 874 F.3d at 81.

Search warrants issued by a judicial officer "upon a finding of probable cause" are "presumptively reasonable."  *Ganek*, 874 F.3d at 81.  However, this "presumption can be defeated by showing that a defendant (1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant, (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause."  *Id.*; *see also Siddiqui v. Rocheleau*, No. 3:18-CV-00839, 2019 WL 12239678, at *22 (D. Conn. May 15, 2019), *aff'd*, 818 F. App'x 20 (2d Cir. 2020).  *See also Franks v. Delaware*, 438 U.S. 154, 156 (1978).  Determining whether such false statements or material omissions were indeed necessary is a "mixed question of law and fact."  *Southerland v. City of New York*, 680 F.3d 127, 144 (2d Cir. 2012) (citing *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994)).

Courts in this Circuit conduct a "corrected affidavit test" for the qualified immunity analysis to determine whether a warrant application's false or omitted information was necessary to a finding of probable cause and, in turn, whether an

affidavit caused a violation of a plaintiff's Fourth Amendment rights.  *Ganek*, 874 F.3d at 81–82; *see also Siddiqui*, 2019 WL 12239678, at *22–23.  Under the corrected affidavit test, a hypothetical corrected affidavit is created "by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information."  *Ganek*, 874 F.3d at 82.  If the corrected warrant establishes probable cause, then the "plaintiff has suffered no violation of Fourth Amendment rights, and [the] defendants [are] entitled to qualified immunity and dismissal at the first step of [the qualified immunity] analysis."  *Id.*

Plaintiffs provide a list of "corrections" that they argue were wrongfully withheld from the original search warrant affidavit, and argue if those corrections were provided, the warrant would lack probable cause.  This requires consideration of the legal standard of probable cause.  Probable cause to search is established when, "given all the circumstances set forth in the affidavit, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007); *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) ("When the affidavit in support of the search warrant is based on information obtained from a confidential informant, 'courts assess the information by examining the 'totality of the circumstances' bearing upon its reliability.") (quoting *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993)).  Although probable cause requires more than a "mere suspicion of wrongdoing," the standard does not demand "hard certainties," *Gates*, 462 U.S. at 231, and is not a "high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014).  Furthermore,

probable cause does not necessitate a prima facie case, nor a "more likely than not" showing, of criminal activity. *Ganek*, 874 F.3d at 83; *Siddiqui*, 2019 WL 12239678, at *5. Instead, probable cause asks that the "facts [be] sufficient to establish the sort of fair probability on which 'reasonable and prudent' people, 'not legal technicians, act.'" *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (quoting *Gates*, 462 U.S. at 231); *see also United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998) ("A reviewing court should not interpret supporting affidavits in a hypertechnical, rather than a commonsense manner.  The resolution of doubtful cases should be largely determined by the preference to be accorded to warrants.").  A judge must simply "make a *practical, common-sense* decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 238) (internal quotation marks omitted).

Even if the corrected affidavit fails to show probable cause, a defendant may still be entitled to qualified immunity if the corrected affidavit establishes "arguable probable cause" at the second step of the qualified immunity analysis. *Siddiqui*, 2019 WL 12239678, at *7; *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004).  Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met*."* *Siddiqui*, 2019 WL 12239678, at *7; *see Ganek*, 874 F.3d at 82 (stating qualified immunity may still apply "if a similarly situated law enforcement official could

14

have held an objectively reasonable–even if mistaken–belief that the corrected affidavit demonstrated the necessary probable cause").

### a. Tendler's Search Warrant Affidavit

Tendler argues an entitlement to qualified immunity because, even if the corrections proposed by Plaintiffs were deemed wrongfully withheld, the corrected affidavit would be supported by probable cause.  Plaintiffs' argue the affidavit fails to show probable cause when all information known to law enforcement about Smith's credibility was included, or all unreliable information learned from Smith is excluded.  Thus, Plaintiff's opposition appears to be asserting two theories as to the appropriate application of the corrected affidavit test.  The first theory argues the corrected affidavit should include the evidence of Smith's unreliability, which is identified below as the "addition approach."  The second theory argues the corrected affidavit should exclude all information learned from Smith, which is identified below as the "deletion approach."   The Court will consider both. [3]

### i.   *Addition Approach*

First, under the addition approach, Plaintiffs argue Tendler wrongfully and intentionally omitted information about Smith's prior criminal history, the extortion scheme, and his compensation for the information provided.  Plaintiffs appear to suggest that a neutral and detached magistrate judge with this

---

[3] An argument could be made that Plaintiffs failed to plead the deletion approach in their complaint, which only alleges a constitutional violation with the failure to add information about Smith's reliability.  Defendants did not make said argument in their reply, and the Court need not decide whether the failure to plead would be an independent basis for rejecting Plaintiffs' argument.

information would be required to discredit all information provided by Smith due to his unreliability.  However, this is not necessarily true because even an unreliable informant can provide information entitled to consideration where there is corroboration, as is the case here.  *See Illinois v. Gates*, 462 U.S. 213, 241–46 (1983).

In determining the value of a tip or information from an informant, courts are to follow the totality-of-the-circumstances approach adopted by the Supreme Court.  *Id.* at 230–31.  The Supreme Court explicitly rejected an approach that requires "veracity" or "reliability," and "basis of knowledge" be considered separately.  *Id.*  Rather, the correct approach in determining how much weight to give to an informant tip requires balancing of these elements; "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."  *Id.* at 233.

Here, if the proposed additions were made to the affidavit, there would still be probable cause justifying the issuance of the search warrant.  First, a great portion of the information provided by Smith in the initial letter was corroborated by independent police work.  Namely, Smith's claims that Lotto lived at 9 North Bank Street, Lotto was employed by USPS, Lotto had a drug arrest from 2014, and Lotto and Canteen were arrested in 2018 for assault.  Second, law enforcement conducted its own investigation that did not involve Smith, including intercepted parcels of narcotics, and multiple controlled purchases, all of which were connected in some way to Plaintiffs and their property.  In addition, two of the controlled purchases involved Smith, which bolster his credibility with

respect to the allegations raised against Plaintiffs.  *See Wagner*, 989 F.2d at 73 ("An informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause.").  Thus, if the affidavit was modified to add the information proposed by Plaintiffs, such additional information would not justify a complete disregard of Smith's tips and involvement considering the corroboration and Smith's participation.

      ii.    *Deletion Approach*

      Second, under Plaintiffs' deletion approach, they argue that if all information provided by Smith was deleted from the search warrant application affidavit, it would lack probable cause.  However, Plaintiffs' opposition fails to address the great deal of other evidence, entirely unrelated to Smith, that establishes probable cause for the search warrant for 9 North Bank Street.  This includes the multiple intercepted parcels of narcotics, all of which were addressed to 9 North Bank Street.  In addition, there were four controlled purchases.  Two of the controlled purchases occurred at 9 North Bank Street and the other two involved people who sold narcotics after just leaving 9 North Bank Street and then returning immediately thereafter.  All of the controlled purchases involved Canteen, and Canteen was known to reside at 9 North Bank Street.

      Therefore, if the search warrant application affidavit was modified by deleting all information provided by Smith, the Court finds the warrant would be supported by probable cause, and thus Plaintiffs' have not suffered a Fourth Amendment violation and Defendants are entitled to qualified immunity for those claims.  Thus, Plaintiff's Fourth Amendment violation claims are dismissed.

Plaintiffs' claims with respect to the other law enforcement officer defendants argues that those defendants knew or should have known Tendler violated Plaintiffs' constitutional rights.  This argument is premised on the Court finding that Tendler violated Plaintiffs' constitutional rights.  Because the Court has not found said violation, the Court dismisses Plaintiffs' claim against the other defendants.

IV.     Conclusion

For the aforementioned reasons, the Court GRANTS the Motion to Dismiss. The case is dismissed, and the Clerk is directed to close the case.

IT IS SO ORDERED.

_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: January 9, 2023